# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued November 9, 2016          Decided April 25, 2017

No. 16-7041

SOUNDEXCHANGE, INC.,
APPELLANT

v.

MUZAK LLC,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00476)

---

*Joshua M. Segal* argued the cause for appellant. With him on the briefs were *Michael B. DeSanctis*, *Emily L. Chapuis*, and *Devi M. Rao*. *David A. Handzo* entered an appearance.

*Brian M. Willen* argued the cause for appellee. With him on the brief was *Gary R. Greenstein*.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Concurring opinion filed by *Circuit Judge* ROGERS.

SILBERMAN, *Senior Circuit Judge*: This case pits SoundExchange, a nonprofit entity, charged with the responsibility of collecting royalties for performing artists and copyright owners of music, against Muzak, a company that supplies digital music channels to satellite television networks who, in turn, sell to subscribers. SoundExchange sued Muzak under the Copyright Act in district court, claiming that Muzak underpaid royalties owed. The district court dismissed SoundExchange's complaint. (From the point of view of classic administrative law, the Register of Copyrights, to which we normally are obliged to defer, plays a rather unusual role.) Although the case is close – the controlling statute is dreadfully ambiguous – we conclude that SoundExchange has the better position, and therefore reverse the district court.

## I.

Muzak is a curator of copyrighted work. It generates revenue by packaging sound recordings into digital music-only channels and providing those channels to individuals who subscribe to cable and satellite television system operators. Businesses such as Muzak (called subscription services) at one time were not required to obtain a license to publicly perform sound recordings because copyright owners did not have an exclusive right to publicly perform their work. But, sensing that emerging technology posed a threat to copyright owners' interests, Congress stepped in. The Digital Performance Right in Sound Recordings Act of 1995 gave copyright owners an exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission."[1]

---

[1] *See* Pub. L. No. 104-39, § 2, 109 Stat. 336, 336 (1995) (codified at 17 U.S.C. § 106(6)); *see also* H.R. Rep. No. 104-274, at 13 (1995).

However, entities such as Muzak could obtain a statutory license that allowed them to play copyrighted music in return for the payment of "reasonable rates." These rates are set in adversarial rule-making proceedings every five years by a Copyright Royalty Board.[2] The first such proceeding began in 1996. Three curator companies participated: Muzak, Digital Cable Radio Associates (operating as "Music Choice"), and DMX Music, Inc. The panel set rates that, some argued, favored the subscription services providers over the copyright holders. *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings*, 63 Fed. Reg. 25,394, 25,406 (May 8, 1998). Congress, persuaded, revisited the issue and passed the present statute, the Digital Millennium Copyright Act (the Act), which instructed the Royalty Board's predecessor to set rates reflecting those that "would have been negotiated in the marketplace between a willing buyer and a willing seller," i.e., market rates.[3] That standard favored the copyright holders.

As an obvious compromise, however – in a concession to the businesses that had invested under the more favorable pre-1998 rates – the Act provides a grandfather clause. "Preexisting subscription services" could still pay rates set according to the old method. "New subscription services," on the other hand, were relegated to the new rate-making regime based on a

---

[2] *See* 17 U.S.C. § 114(f). The predecessor to the Copyright Royalty Board, the Copyright Arbitration Royalty Panel, was phased out by the Copyright Royalty and Distribution Reform Act of 2004. *See* Pub. L. No. 108-419, § 5, 118 Stat. 2341, 2363.

[3] *See* Pub. L. No. 105-304, § 405(a), 112 Stat. 2860, 2896 (1998) (codified at 17 U.S.C. § 114(f)(2)(B)).

hypothetical free market.[4] As should be obvious, a grandfather status is quite valuable and it is that status – the meaning of "preexisting subscription service" – at stake in this case.

At the time Congress acted, Muzak apparently provided its collection of music channels only to customers of the satellite television network called the Dish Network (owned by EchoStar Corporation and then branded as the DiSH Network). Taking the name of the program from its distributor, the package of music-only channels was called DishCD. (The Dish Network also provided its customers other unrelated programming such as television channels.)

SoundExchange is designated by regulation as the sole representative of the copyright holders.[5] Its job is to obtain the royalties owed under the statutory licenses and to distribute them to performing artists and copyright holders. In this case, SoundExchange claims that Muzak owes it substantial royalties because Muzak erroneously applied the grandfather rate to ineligible transmissions and therefore underpaid.

The controversy stems from a series of corporate transactions. In 2011, Mood Media Corporation acquired Muzak, as well as, in 2012, one of Muzak's competitors, DMX. DMX offered a music program called SonicTap, which was quite similar to Muzak's DishCD, but was transmitted over a different satellite television network, DirecTV. Before Mood

---

[4] *Compare* 17 U.S.C. § 114(f)(1)(B) (preexisting subscription services) *with id*. § 114(f)(2)(B) (new subscription services).

[5] *See* 37 C.F.R. §§ 380.4, 382.2, 382.11, 382.13; *see also* 17 U.S.C. § 114(g).

Media bought DMX and put it under the same corporate roof as Muzak, DMX was not entitled to, nor did it pay, the grandfather rates for its SonicTap program. (It will be recalled that an entity called "DMX" participated in the original rate-making proceedings beginning in 1996. But, due to corporate restructuring, that legal entity is not the same one as the "DMX" that Mood acquired in 2011.) After Mood bought both companies, it arranged to have DMX transfer to Muzak the right to make transmissions to DirecTV subscribers under the SonicTap brand.[6] When the smoke cleared, Muzak had acquired DMX's consumer music customers.

After the corporate transactions, Muzak paid the grandfathered rate for *all* of its subscription service transmissions, which, as noted, led SoundExchange to sue in district court under the Copyright Act. SoundExchange claimed that Muzak was entitled to pay the more favorable rate only for its transmissions packaged as DishCD, but not for those made under the SonicTap brand or any others. The district court, essentially equating the new customers acquired by acquisition of DMX to new customers Muzak acquired on its own, dismissed the complaint. *See SoundExchange, Inc. v. Muzak, LLC*, 167 F. Supp. 3d 147 (D.D.C. 2016).

## II.

The dispute between the parties turns on the language of the Act, specifically, what does "preexisting subscription service" (the grandfathered category defined by the Act) mean? Does it refer to Muzak, the business entity, however it grows?

---

[6] Muzak also gained the right to provide music to other distributors previously served by DMX.

Or is that term limited to the program offering, DishCD, that was marketed by Muzak at the time the statute was passed?

The Act defines a "preexisting subscription service" as:

> [A] service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998. . . .[7]

The parties quarrel over the meaning of the phrase "such transmissions." SoundExchange seeks a rather less textual interpretation, i.e., that "such transmissions" refers to more than the language that precedes it (generic "noninteractive audio-only subscription digital audio transmissions"), and instead refers specifically to the program a claimant was offering to the public at the relevant time. Muzak, by contrast, argues that "such transmissions" refers to the general category of transmissions identified in the preceding part of the definition: noninteractive audio-only subscription digital audio transmissions made by an entity that was in existence and making that category of transmissions on or before July 31, 1998.

Muzak's reading of "such transmissions" is the more persuasive. *Cf. Middle S. Energy, Inc. v. FERC*, 747 F.2d 763, 768 (D.C. Cir. 1984). But we do not think the crucial phrase is "such transmissions." Rather, it is the term "service," which is also disputed. Does "service" refer only to the business entity, or does it also include the original program offerings? Put

---

[7] 17 U.S.C. § 114(j)(11).

differently, does the grandfather rate inhere in the business or the product? Here, we are faced with persistent confusion.

Unfortunately, the statute is quite unclear. It uses the word "service" in both senses. Some sentences only make sense if "service" means business entity. For example, one provision allows, in some circumstances, that "services . . . submit to the Copyright Royalty Judges licenses. . . ."[8] There, the "service" must be an entity capable of submitting a license to the Judges; it makes no sense to talk of a program offering such as DishCD "submitting" something to anyone. But then in other parts of the same statute, "service" most logically refers to a program offering. In the provision immediately preceding the main disputed language that defines "preexisting satellite digital audio radio service," Congress said that term refers to a "service" that is, among other things, "provided pursuant to a . . . license issued by the Federal Communications Commission. . . ."[9] So "service" there must indicate a program offering because an entity would not be "provided *pursuant to* a . . . license." (emphasis added). Perhaps strangest of all, the statute permits any "preexisting subscription *service*" to file a petition for an off-cycle rate-making if a "new type of . . . *service*" becomes operational.[10] That is to say, a "service" can file a rate-making petition if it will provide a new "type of service," which is, of course, circular.

---

[8] *Id.* § 114(f)(1)(A).

[9] *Id.* § 114(j)(10).

[10] *Id.* § 114(f)(1)(C) (emphasis added).

The legislative history is no more pellucid; it, too, uses "service" both ways. For example, when the report discusses the meaning of preexisting subscription service, it provides an illustration: "[I]f a cable subscription music service making transmissions on July 31, 1998, were to offer the same music service through the Internet, then such Internet service would be considered part of a preexisting subscription service." H.R. Rep. No. 105-796, at 89 (1998), *reprinted in* 1998 U.S.C.C.A.N. 639, 664. That explanation uses "service" to describe the entity making the transmissions (cable service) *and* the transmissions themselves (the "offered" service), in other words, a "service" offering a "service."[11]

---

[11] Our concurring colleague would make more use of the legislative history when resolving this case. But for each point in the conference report supporting SoundExchange, there can be found a countervailing one in support of Muzak. And many of the report's observations are susceptible of multiple interpretations – as evidenced by the pages the parties (and the concurrence) devote to disputing the significance of individual phrases in that report. During the 2006 Copyright Office proceedings, *SoundExchange itself discouraged over-reliance on the "imprecise language of the legislative history," which is "clearly inconsistent with the statute itself."*

Take the phrase in the report most relied on by the concurrence: "There [are] only three [preexisting subscription services] that exist: DMX (operated by TCI Music), Music Choice (operated by Digital Cable Radio Associates), and the DiSH Network (operated by Muzak)." The concurrence finds this phrase illuminating, pointing out that "the Report's sole reference to 'Muzak' is in its connection with DiSH." Concur. Op. at 4. But that is incorrect. The Report confusingly refers to "the DiSH Network (operated by Muzak)", even

As if this was not puzzling enough, it turns out that the Register has issued a relevant opinion, which only adds to the confusion. Although it is the Royalty Board that sets rates every five years, the statute provides that "[i]n any case in which a novel material question of substantive law concerning an interpretation of those provisions of this title that are the subject of the proceeding is presented, the Copyright Royalty judges *shall* request a decision of the Register of Copyrights . . . to resolve such novel question." Moreover, the Register "may review," on her own motion, any legal error contained in a final determination of the Copyright Royalty Judges and can correct the error in the proceeding. It is to be binding precedent. And a determination of the Copyright Royalty Judges, which includes any legal determination the Register made as part of the proceeding, may be appealed directly to our court, the U.S. Court of Appeals for the D.C. Circuit, by any aggrieved participant in the proceeding.[12]

As it happened, in 2006 the Register was asked by the Board for, and did deliver, an opinion that affects our case because it dealt with the scope of the grandfather clause. *See Designation as a Preexisting Subscription Service*, 71 Fed. Reg. 64,639 (Nov. 3, 2006). At the time, Sirius Satellite Radio, a satellite digital audio radio business, claimed that some of its

---

though the DiSH Network was an entirely separate satellite television network *not* "operated by Muzak."

[12] 17 U.S.C. § 802(f)(1)(B)(i) (referral to Register); *id*. § 802(f)(1)(D) (Register review); *id*. § 803(d)(1) (judicial review).

transmissions were eligible for the grandfather rate – transmissions that were made over the Dish Network to Dish Network subscribers (recall that the Dish Network, a satellite television network, was identified in the conference report as the satellite network over which Muzak was providing its content at the time the statute was passed). In short, Sirius asserted the grandfather status attached to the network, not the curator.

Although there is no record as to how the Board sought the Register's view, we are told by the government that the issue arose because the Board asked the Register whether Sirius could participate in the rate-making proceeding. The question put to the Board was:

> Is the universe of preexisting subscription services – defined in [the preexisting subscription services provision] – [limited by] law to only Muzak (provided over the DiSH Network), Music Choice, and DMX?

*Id.* at 64,640. The Register in turn characterized the question as "a controversy over whether the term ["preexisting subscription service"] applied to the use of the sound recording, or the business entity that operated under the § 114 statutory license." *Id.* at 64,647.

The Register did not have an easy time of it. She recognized, as do we, that the word "service," as used both in the statute as well as the legislative history, sometimes referred to the business entity and sometimes the program offerings. *Id.* at 64,646. Nevertheless, she rejected Sirius's claim, determining that only three business entities – Muzak, Music Choice, and the old DMX – were expressly designated in the conference report

as the companies entitled to pay the grandfather rate. Muzak insists she therefore determined that it was the business entity that was entitled to grandfather status. Yet, as Muzak concedes, the Register's opinion doesn't foreclose SoundExchange's position. Her opinion did not address whether those three business entities' grandfather status was further limited to the programs they were offering at the time the statute was passed.

As we examined the Register's opinion, it occurred to us to wonder why our case was not before the Register. Indeed, since Royalty Board decisions are appealed to our court, did the district court even have jurisdiction? We asked for supplemental briefs, including from the Justice Department, and were persuaded that, under this unusual statute, the legal issues that go to the Register do so only as part of the every-five-year rate "proceeding," and only then can be appealed to our court. As we explained, the 2006 Register opinion was issued *only* because the Board asked whether Sirius could participate in the rate proceeding, whereas our case is divorced from a rate proceeding. Of course, since we have held that a Register's opinion is entitled to deference under *Chevron*, *see Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am.*, 836 F.2d 599, 609 (D.C. Cir. 1988), it is conceivable that should this exact issue come up during a rate proceeding, the Register might legitimately differ with us, *cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

In any event, although the Register did not decide our issue, she did emphasize that the grandfather clause should be interpreted narrowly. *See* 71 Fed. Reg. at 64,645. We should respect her guide to interpretation. The district judge analyzed Muzak's acquisition of DMX as analogous to Muzak simply

acquiring more customers through Dish Network's expansion customer by customer. 167 F. Supp. 3d at 151. But we do not think that is a fair comparison. Indeed, Mood-Muzak's acquisition of DMX, if allowed to expand Muzak's grandfather eligibility to "services" other than DishCD, threatens the very purpose of the Act. After all, it was designed to move the industry to market rates. If Mood-Muzak were permitted to pay the grandfather rate for transmissions made to customers who subscribed to a "service" that was previously provided by DMX, what would prevent – assuming no anti-trust barriers – the complete elimination of the market-rate regime by Mood-Muzak's acquisitions strategy.

The grandfather provisions were intended to protect prior investments the three business entities had made during a more favorable pre-1998 rate-setting regulatory climate. "Muzak was [a] pioneer music service that incurred both the benefits and risks that came with its investment," specifically its investment in DishCD. 71 Fed. Reg. at 64,646. But when Muzak expands its operations and provides additional transmissions to subscribers to a different "service," (i.e., SonicTap), this is an entirely new investment.

\* \* \*

We conclude, therefore, that the better interpretation of the statute is that the term "service" contemplates a double limitation; both the business and the program offering must qualify before the transmissions are eligible for the favorable rate.

*So ordered.*

ROGERS, *Circuit Judge*, concurring: The court describes the context in which the parties differ on when rates under a grandfather clause in the Digital Millennium Copyright Act of 1998 ("DMCA"), Pub. L. No. 105-304, 116 Stat. 2860, are available. I write separately to expand on the reasons for my concurrence.

As a general rule, grandfather clauses that operate in derogation of a statute's dominant purpose should be narrowly construed. *Patagonia Corp. v. Bd. of Governors*, 517 F.2d 803, 811 (9th Cir. 1975). The DMCA defines a "preexisting subscription service" ("PSS") as

> a service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998, and may include a limited number of sample channels representative of the subscription service that are made available on a nonsubscription basis in order to promote the subscription service.

17 U.S.C. § 114(j)(11). The parties offer differing interpretations of the phrase "such transmissions" and the word "service." Although the court does not view the former as "the crucial phrase," Op. at 6, it considers the word "service" to present "persistent confusion," *id.* at 7. Does it refer only to the business entity or also to the entity's original program offerings? Congress uses words to have their ordinary meaning, absent a contrary indication, *see Engine Manufacturers Ass'n v. South Coast Air Quality Management District*, 541 U.S. 246, 252 (2004), and there is none here; the word "service" can mean both an entity (such as a branch of the armed services) and the activity performed by that entity. *E.g.*, RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 1199 (2d ed. 1999) ("the *supplying or supplier* of utilities . . . that meet a public need") (emphasis added).

Where there are two plausible interpretations of the statutory text, the court has turned to the legislative history to discover congressional intent. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 271 (D.C. Cir. 2001). Indeed, the court has done so even when the text is superficially clear. *See Sierra Club v. EPA*, 353 F.3d 976, 988 (D.C. Cir. 2004). Today the court is quick to dismiss that history as "no more pellucid" than the statutory text merely because it too uses the term "service" both ways. Op. at 8. But this ignores clear evidence of congressional intent: the conferees gave careful consideration to the intended extent of PSS eligibility for grandfather rates, and their analysis resolves the debate over the meaning of the grandfather clause in favor of SoundExchange.

The Conference Report of the House and Senate conferees confirms that Muzak's non-Dish offerings are ineligible for PSS rates. The Report states that "[t]he purpose of distinguishing preexisting subscription services making transmissions in the same medium as on July 31, 1998, was to prevent disruption of the existing operations by such services," and that "[t]here [are] only three such services that exist: DMX (operated by TCI Music), Music Choice (operated by Digital Cable Radio Associates), and the DiSH Network (operated by Muzak)." H.R. Conf. Rep. 105–796, at 80–81 (1998), *reprinted in* 1998 U.S.C.C.A.N. 639, 656–57. The Report paraphrased the statutory definition, stating that a PSS "is a noninteractive subscription service that was in existence and was making transmissions to the public on or before July 31, 1998, *and which is making transmissions similar in character to such transmissions made on or before July 31, 1998.*" *Id.* at 89, *reprinted in* 1998 U.S.C.C.A.N. at 665 (emphasis added). The Report proceeded to illustrate the extent of a PSS's offerings that would be eligible for the grandfather rates, explaining the grandfather clause covered two circumstances only: "In grandfathering these services [*i.e.*, the three PSSs], the

conferee's objective was to limit the grandfather [1] to their existing services in the same transmission medium and [2] to any new services in a new transmission medium where only transmissions similar to their existing service are provided." *Id.* The Report gave examples of the relevant program offerings: "[I]f a cable subscription music service making transmissions on July 31, 1998, were to offer *the same music service* through the Internet, then such Internet service would be considered part of a preexisting subscription service." *Id.* (emphasis added). But if "a subscription service making transmissions on July 31, 1998, were to offer *a new service* either in the same or new transmission medium . . . , such new service would not quality as a preexisting subscription service." *Id.* (emphasis added).

The Report thus makes clear that when Congress acted in 1998 there were only three PSS entities (*i.e.*, Muzak, TCI Music, and Digital Cable Radio Associates) and that eligibility for grandfather rates did not extend to altogether new program offerings made by those entities. The Report also makes clear that identifying grandfathered program offerings requires more than consideration of whether an entity's present transmissions are "noninteractive audio-only subscription digital audio transmissions," *but see* Appellee Br. 16–17 (quoting 17 U.S.C. § 114(j)(11)), because the grandfathered program offerings are limited to those that the entity "made on or before July 31, 1998." H.R. Conf. Rep. 105–796, at 89. The Report's use of the phrase "their existing services" necessarily required a comparison to the specific services the entity was offering before July 31, 1998, *id.*, not simply comparison with "noninteractive audio-only subscription digital audio transmissions" in the abstract. 17 U.S.C. § 114(j)(11). And the examples given show that the entity "must 'offer the same music service' as it was offering over cable" in order for that service to be eligible for the grandfather rate. Appellant Reply Br. 13 (quoting H.R. Conf. Rep. 105–796, at 89). The 2006 decision

of the Register of Copyrights underscores that PSS eligibility requires not only that the entity (*i.e.*, the "PSS service") be the same as in 1998, but that the music offering (the programmatic "service") be the same. *See Designation as a Preexisting Subscription Service*, 71 Fed. Reg. 64,639, 64,646 (Nov. 3, 2006). It is undisputed that Muzak began offering SonicTap in May 2014, and thus the SonicTap offering does not qualify for the grandfather rate.

In sum, the Conference Report shows how the multiple meanings of the word "service" are to apply to the statutory definition and thereby demonstrates that Muzak's non-DiSH offerings were not entitled to the grandfather rates. Although the Report is imprecise in any suggestion that entities other than Muzak might be able to pay grandfather rates for transmission over DiSH, *see* 71 Fed. Reg. at 64,645–46, that imprecision does not mean Muzak is entitled to pay PSS rates for its non-DiSH offerings because the Report's sole reference to "Muzak" is in its connection with DiSH. Appellant Reply Br. 1–2. My colleagues insist that this is "incorrect" simply because the Report refers to "DiSH Network" rather than to its music offering "DishCD," Op. at 8 n.11, without calling into question the more fundamental point: no matter how the Report refers to DiSH, "nowhere did the Report [refer to] Muzak qua Muzak as the relevant PSS." Appellant Br. 27. Nor do my colleagues offer any support for their claim that "for every point in the conference report supporting SoundExchange, there can be found a countervailing one in support of Muzak," Op. at 8 n.11, particularly as regards the passages discussed herein showing Congress's intent to impose on PSSs a double limitation (same entity and same program offering).

Especially in light of the conferees' explanation of the grandfather clause, then, I concur in reversing the dismissal of SoundExchange's complaint.