# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 20, 2020       Decided August 18, 2020

No. 19-1011

MUSIC CHOICE,
APPELLANT

v.

COPYRIGHT ROYALTY BOARD, ET AL.,
APPELLEES

SOUNDEXCHANGE, INC.,
INTERVENOR

———

On Appeal from a Final Determination of the Copyright
Royalty Board and a Memorandum Opinion of the Register of
Copyrights

———

*Paul M. Fakler* argued the cause for appellant. With him on the briefs was *Kelsi Brown Corkran*. *Margaret Wheeler-Frothingham* entered an appearance.

*Jennifer L. Utrecht*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Daniel Tenny*, Attorney. *Mark R. Freeman*, Attorney, entered an appearance.

*Matthew S. Hellman* argued the cause for intervenor. With him on the brief were *David A. Handzo*, *Emily L. Chapuis*, and *Devi M. Rao*.

Before: SRINIVASAN, *Chief Judge*, RAO, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: The case raises the question of what copyright royalty rate must be paid by Music Choice for transmissions of digital music over the internet. Pursuant to the Digital Millennium Copyright Act ("DMCA"), a lower grandfathered royalty rate is paid by some music services that were early providers of digital music transmissions. Music Choice challenges a Final Determination of the Copyright Royalty Board ("the Board"), which excludes Music Choice's internet transmissions from the grandfathered rate and also adopts more stringent audit requirements.

We hold that the Board's categorical exclusion of Music Choice's internet transmissions from the grandfathered rate conflicts with the unambiguous language of the DMCA. Under the DMCA, Music Choice's internet transmissions are eligible for the grandfathered rate to the extent they were part of its service offering on July 31, 1998. The Board, however, retains discretion to determine whether parts of Music Choice's current service offering, which includes mobile applications and internet-exclusive channels, should be excluded from the grandfathered rate. The Board also acted arbitrarily and capriciously in altering the audit standards applicable to Music Choice. Accordingly, we vacate the relevant parts of the Final Determination and remand for the Board to determine if Music Choice's internet transmissions qualify for the grandfathered rate and to reconsider the amended audit procedure.

I.

Started in the late 1980s, Music Choice is a digital broadcast music service that consists of several cable television channels. These channels are often included with digital cable television packages and now are also available to cable subscribers over the internet. Prior to 1995, subscription music services such as Music Choice did not have to "obtain a license to publicly perform sound recordings because copyright owners did not have an exclusive right to publicly perform their work." *See SoundExchange, Inc. v. Muzak LLC*, 854 F.3d 713, 714 (D.C. Cir. 2017). Amidst the growth of digital music transmissions, Congress enacted the Digital Performance Right in Sound Recordings Act of 1995 to grant copyright protections to the digital transmissions of music and other recordings protected by copyright. Pub. L. No. 104-39, 109 Stat. 336. This copyright protection was subject to a compulsory licensing regime, set out in Section 114 of the Copyright Act, in which existing subscription music services, including Music Choice, would be entitled to continue transmitting copyrighted works in exchange for a royalty payment. *Muzak*, 854 F.3d at 714–15 & n.2. The amount and terms of such royalty payments were determined by the Copyright Arbitration Royalty Panel ("CARP") based on a reasonable rate standard. *See id.*

Congress modified this regime in the Digital Millennium Copyright Act, which requires certain digital music services to pay royalty rates at a market-based standard.[1] Pub. L. No. 105-304, § 415(a), 112 Stat. 2860, 2896 (1998) (codified at 17 U.S.C. § 114(f)(2)(B)). The market-based standard generally results in higher royalty rates for copyright holders. The

---

[1] Rather than letting the market decide what a market-based rate would be, the DMCA charged CARP with predicting what the market-based rate would be.

DMCA, however, includes a grandfathering provision that makes preexisting subscription-based services, such as Music Choice, eligible to pay only "reasonable rates," which generally allow the service providers to pay lower royalty rates. *Muzak*, 854 F.3d at 714–15. To be eligible for the grandfathered rate, a service must qualify as a "preexisting subscription service," (hereinafter "preexisting service") defined as "a service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998." 17 U.S.C. § 114(j)(11). If a preexisting service's "subscription transmission" is made "in the same transmission medium used by such service on July 31, 1998," it is entitled to the grandfathered royalty rate. 17 U.S.C. § 114(d)(2)(B) (hereinafter the "unconditional grandfathered rate"). A transmission made by a preexisting service in a different transmission medium, or by a "new subscription service," may also be eligible for the grandfathered rate if it meets several additional conditions and requirements. 17 U.S.C. § 114(d)(2)(C) (hereinafter the "conditional grandfathered rate").

To determine the royalty rate to be paid by a preexisting service, the Copyright Royalty Board[2] holds adversarial rule-making proceedings every five years. *Muzak*, 854 F.3d at 715. The copyright holders are represented in these proceedings by SoundExchange, a nonprofit entity designated by regulation to "obtain the royalties owed under the statutory licenses and to

---

[2] The Copyright Royalty Board was created by the Copyright Royalty and Distribution Reform Act of 2004 to conduct royalty proceedings, thus replacing the Copyright Arbitration Royalty Panel. Pub. L. No. 108-419, § 5, 118 Stat. 2341, 2363.

distribute them to performing artists and copyright holders."[3] *Id.*

In 2016, the Board commenced the proceeding under review to establish preexisting service royalty rates for the years 2018 to 2022. As relevant here, the proceeding concerned the royalty rates Music Choice, the only remaining preexisting service participating, must pay to copyright holders by way of SoundExchange. Over the course of the proceeding, the Board referred to the Register of Copyrights the legal question of whether Music Choice's internet transmissions qualify as a preexisting service. 83 Fed. Reg. 65,210, 65,225–226 (Dec. 19, 2018) (citing 17 U.S.C. § 802(f)(1)(B)). The Register determined that, as a matter of law, internet transmissions are categorically excluded from the unconditional grandfathered rate because the DMCA's "legislative history makes clear that Congress … intended to limit" the grandfathered rate to Music Choice's "offerings in the specific transmission media affirmatively identified in the DMCA Conference Report: 'cable' or 'satellite.'" 82 Fed. Reg. 59,652, 59,657 (Dec. 15, 2017) (citing H.R. Rep. No. 105-796, at 89 (1998)). The Register went on to set out a non-exhaustive six-factor test to guide the Board's determination of whether Music Choice's internet transmissions qualify for the conditional grandfathered rate. *Id.* at 59,658–659.

In the Final Determination setting rates for the 2018 to 2022 period, the Board applied the Register's legal opinion and

---

[3] The Digital Millennium Copyright Act instructs the Board to designate a "nonprofit collective" to receive royalty payments from music services and distribute them to copyright holders and artists. 17 U.S.C. § 114(g)(2), (3). The Board has designated SoundExchange as the exclusive entity to collect and distribute copyright royalties. *See* 37 C.F.R. § 382.5(d).

excluded Music Choice's internet transmissions from the unconditional grandfathered rate. 83 Fed. Reg. at 65,227. The Board went on to apply the Register's six-factor test to determine that Music Choice's internet transmissions are also excluded from the conditional grandfathered rate "to the extent they are available outside a subscriber's residence," such as through mobile applications. *Id.* Because Music Choice's internet transmissions did not qualify for either grandfathered rate, they would be subject to the higher market-based royalty rate. *Id.*

In the Final Determination, the Board also amended the audit procedures applicable to preexisting services such as Music Choice. The longstanding regulatory standard allowed preexisting services to satisfy in full any audit obligations by employing independent auditors in accordance with "generally accepted auditing standards." *Id.* at 65,262, 65,268. The Board amended this standard so that the independent audit would provide a safe harbor only for claims "within the scope of the audit," which meant that SoundExchange would be "permitted to round out the findings [of Music Choice's independent audit] with its own audit, limited to the points omitted from the scope of the defensive audit." *Id.* at 65,262. This auditing change was long sought after by SoundExchange and consistently opposed by Music Choice.

Music Choice appeals the Final Determination. This court has exclusive jurisdiction over Copyright Royalty Board determinations and any legal determinations the Register made as part of the proceeding. *See Muzak*, 854 F.3d at 717–18; 17 U.S.C. § 803(d)(1). Such determinations may be appealed by "any aggrieved participant in the proceeding … who fully participated in the proceeding and who would be bound by the determination." 17 U.S.C. § 803(d)(1). Music Choice meets

these criteria. SoundExchange intervened to defend the Board's actions.

## II.

Music Choice challenges three separate aspects of the Board's Final Determination. First, it argues that the Board should not have referred to the Register the legal question regarding whether internet transmissions could be included in the grandfathered rate provision. Second, it challenges the Board's conclusion that Music Choice's internet transmissions, to the extent they are available outside a subscriber's home, are categorically excluded from the grandfathered rate. Third, it challenges the Board's alteration of the audit provision. We review Copyright Royalty Board rate determinations under the Administrative Procedure Act and must "uphold a ratemaking determination unless it is arbitrary, capricious, contrary to law, or not supported by substantial evidence." *Intercollegiate Broad. Sys., Inc. v. CRB*, 796 F.3d 111, 127 (D.C. Cir. 2015) (quotation marks omitted); *see also* 5 U.S.C. § 706(2)(A).

## A.

Music Choice first contends that the Board erred by referring the internet transmission issue to the Register for a binding legal opinion. The Copyright Act requires the Board to refer a "novel material question of substantive law" that "is presented" in a royalty proceeding to the Register for a binding opinion. 17 U.S.C. § 802(f)(1)(B)(i).[4] Music Choice maintains

---

[4] 17 U.S.C. § 802(f)(1)(B)(i) states:

> In any case in which a novel material question of substantive law concerning an interpretation of those provisions of this title that are the subject of the proceeding is presented, the Copyright Royalty Judges shall request a decision of the Register of

that a party must "present" a legal issue before the Board can refer it to the Register and no party raised the legal issue in this case. The government responds that the Board must, or at least may, refer to the Register novel and material legal issues that arise in a proceeding. Alternatively, the government argues that the referral was proper even under Music Choice's interpretation because SoundExchange raised the internet transmission issue during the proceeding.

Assuming *arguendo* that Music Choice's interpretation of the statute is correct, the Board's referral to the Register was proper because SoundExchange "presented" the internet transmission issue in the royalty proceeding. Before the rate proceeding concluded, SoundExchange argued that Music Choice's internet transmissions should be subjected to the higher royalty rates applicable to new services rather than the lower grandfathered rates accorded to Music Choice's "core PSS television-based service." Music Choice specifically responded to this argument in its reply to SoundExchange's filing and did not move to reopen the evidentiary record. Thus, we have no occasion to resolve whether the Board may refer novel legal questions on its own motion, because the issue in this case was "presented" by a party, rather than the Board. *Cf.*

---

Copyrights, in writing, to resolve such novel question. Reasonable provision shall be made for comment on such request by the participants in the proceeding, in such a way as to minimize duplication and delay. … If such a decision is timely delivered to the Copyright Royalty Judges, the Copyright Royalty Judges shall apply the legal determinations embodied in the decision of the Register of Copyrights in resolving material questions of substantive law.

*Settling Devotional Claimants v. CRB*, 797 F.3d 1106, 1121 (D.C. Cir. 2015).

To counter this straightforward conclusion, Music Choice takes out of context SoundExchange's statement that it "does not believe it is necessary to decide in this proceeding whether or not Music Choice's webcasts qualify as part of its [preexisting service]." J.A. 127. Read within the context of SoundExchange's proposed conclusions of law, it is clear that SoundExchange was advocating for Music Choice's internet transmissions to be treated differently from its television-based service. By arguing that Music Choice should pay a higher rate for its internet transmissions than its television transmissions, SoundExchange fairly presented the issue the Board ultimately referred to the Register.[5] Moreover, contemporaneous statements from the Board, the Register, SoundExchange, and even Music Choice demonstrate that all parties understood the Board referred the issue in response to SoundExchange's argument regarding different rates for internet transmissions. *See* J.A. 143 (Board referral noting that "SoundExchange seeks

---

[5] SoundExchange further argued: "Here, an Internet-based PSS distributed to mobile apps over the internet is sufficiently different from the core PSS television-based service that the Judges must consider whether the value of the sound recording usage involved is sufficiently reflected in a rate set with a television-based service in mind." J.A. 130–31. SoundExchange also noted that an expert witness "found that the most reasonable way to value webcasting" by Music Choice is to apply "the same statutory rates that would apply to ancillary Internet streaming." *Id.* at 131; *see also id.* at 130 ("Music Choice Should Pay Webcasting Rates For Its Webcasting."). Thus, SoundExchange proposed that the applicable webcasting rates should apply to "any ancillary webcasting" that was part of a preexisting service, rather than the lower rates that apply to television-based transmissions of a preexisting service. *Id.* at 130–31.

two separate royalty payments"); 82 Fed. Reg. at 59,654 (Register decision noting that the "referred questions arose in this proceeding because SoundExchange, Inc., for the first time, is seeking two separate royalty payments"); J.A. 117 (Music Choice's reply to SoundExchange's proposed findings and conclusions noting that "[i]t is crucial to determine whether Music Choice's internet transmissions are part of its [preexisting service]").

Because SoundExchange raised the question of whether internet transmissions should be included in the grandfathered rate, that question was clearly "presented" in the royalty rate proceeding. Accordingly, we hold the Board appropriately referred this issue to the Register for a binding legal opinion.

B.

We next examine Music Choice's challenge to the Register's legal opinion, which determined that internet transmissions are categorically excluded from the unconditional grandfathered rate. 82 Fed. Reg. at 59,657–660. Music Choice questions this categorical exclusion and maintains that its internet transmissions qualify for the grandfathered rate under the plain meaning of the statute. Because the text and structure of the DMCA directly contradict the Register's interpretation, we vacate the Register's legal opinion and the part of the Board's Final Determination that relies upon it.

Under the DMCA, a "subscription digital audio transmission" "shall be subject" to the unconditional grandfathered rate if it is (1) "made by a preexisting subscription service," and (2) offered "in the same transmission medium used by such service on July 31, 1998." 17 U.S.C. § 114(d)(2)(B). If a transmission meets both statutory elements, the Board must determine the royalty in accordance with the

unconditional grandfathered rate. Contrary to the Register's conclusion, neither element categorically excludes internet transmissions.

First, the DMCA's definition of a preexisting subscription service is broad enough to include internet transmissions that were in fact occurring as of July 31, 1998, because it includes any "service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998." 17 U.S.C. § 114(j)(11). We have held that the term "service" in "preexisting subscription service" refers to both the business entity making the transmissions (i.e., Music Choice) and to the "program offering" the entity provides (i.e., the Music Choice digital audio service). *Muzak*, 854 F.3d at 715. Therefore, for a digital audio transmission to qualify as a "preexisting subscription service," first, it must be made by a business entity that was in existence on or before July 31, 1998, and second, the relevant "program offering" must have been in existence on July 31, 1998.

Here, all agree that Music Choice fulfills the first prong. The question is whether the word "service" in the DMCA covers Music Choice's program offerings transmitted via the internet. The Register, relying on the legislative history of the DMCA, concluded that it does not. But the plain language of the DMCA grandfathers a covered entity's program offerings that were "in existence … on or before July 31, 1998." 17 U.S.C. § 114(j)(11). It is undisputed that Music Choice had been providing some digital audio transmissions over the internet since 1996 and was still doing so on July 31, 1998. Those internet transmissions that are part of the same "service" fall within the scope of the DMCA's preexisting service definition. Therefore, the text of the DMCA precludes the

Register's conclusion that the term "preexisting subscription service" categorically excludes Music Choice's internet transmissions. *Cf. Muzak*, 854 F.3d at 716 (declining to impose extra-textual conditions on the plain meaning of the DMCA's preexisting subscription service definition).[6] As discussed below, however, the Board retains discretion in determining the extent to which Music Choice's current internet offerings can fairly be characterized as included in the service offering Music Choice provided on July 31, 1998.

Second, the DMCA applies the unconditional grandfathered rate to transmissions made "in the same transmission medium." 17 U.S.C. § 114(d)(2)(B). This provision does not distinguish between different transmission media, and there is no suggestion in the text that a "transmission medium" excludes internet transmissions. The "transmission medium" clause, like the preexisting service definition, focuses on the actual preexisting entity and program offering, not the manner of transmission. Thus, internet transmissions "shall be subject" to the grandfathered rate if they were "made by" a preexisting service on July 31, 1998. *Id.*

The structure of the DMCA's grandfathered rate provisions also bolsters this conclusion. In contrast to the unconditional grandfathered rate provision, the conditional grandfathered rate provision explicitly distinguishes between

[6] In *Muzak*, we noted the term "preexisting subscription service" was "dreadfully ambiguous" regarding the particular question under review—"[d]oes 'service' refer only to the business entity, or does it also include the original program offerings?" 854 F.3d at 714. As discussed above, the statute is unambiguous regarding the precise question under review in this case—do the terms "preexisting subscription service" and "same transmission medium" preclude internet transmissions even if they were offered by Music Choice on July 31, 1998?

internet and other transmission media. Some of the conditions to qualify for this rate apply to, or specifically exempt, "satellite digital audio service," 17 U.S.C. § 114(d)(2)(C)(v), and "broadcast transmissions," 17 U.S.C. § 114(d)(2)(C)(i), (iii)(IV)(bb), (vii), others apply equally to cable or internet transmissions, 17 U.S.C. § 114(d)(2)(C)(iv) (applying to a "transmitting entity" that "offers transmissions of visual images contemporaneously with transmissions of sound recordings" as in a cable or internet transmission).[7] By specifying categories of transmission media, and including internet alongside cable and satellite, the conditional grandfathered rate provision demonstrates the general terms "subscription service" and "transmission medium," standing alone, do not exclude internet transmissions.

Thus, within the DMCA, Congress knew how to distinguish between types of transmission media and did so explicitly in the conditional grandfathered rate provision. *See Allina Health Servs. v. Price*, 863 F.3d 937, 944 (D.C. Cir. 2017) ("A material variation in terms suggests a variation in meaning.") (quotation marks and brackets omitted). By contrast, the unconditional grandfathered rate provision does

---

[7] The Register refers to this subsection to argue that the DMCA treats issues regarding internet transmissions exclusively under the conditional grandfathered rate provision. The Register's conclusion, however, turns not on the text of the statute, but instead on its legislative history: "The rationale behind ... the new requirements in [the conditional grandfathered rate provision], was to 'address[] unique programming and other issues raised by *Internet transmissions*.'" 82 Fed. Reg. at 59,658 (quoting Staff of H. Comm. on the Judiciary, 105th Cong., Section-By-Section Analysis of H.R. 2281, at 50). The legislative history, however, runs contrary to the plain meaning of the conditional grandfathered rate provision, which does not distinguish between cable, satellite, and internet transmissions that were actually offered on July 31, 1998.

not distinguish between transmission media and therefore cannot be read to exclude internet transmissions. Reading the statute as a whole, the unconditional grandfathered rate provision does not categorically exclude Music Choice's internet service offering to the extent it was available on July 31, 1998.

The Register reached a contrary conclusion only by ignoring the text of the DMCA and focusing on its legislative history. The Register emphasized that the legislative history referred only to cable and satellite transmissions and thus Congress did not intend to include internet transmissions in the unconditional grandfathered rate. According to the Register, "as a matter of law, it is irrelevant whether or not Music Choice or another [preexisting service] entity, to some limited degree, was making transmissions via a *different medium than those specified in the legislative history* on July 31, 1998, such as the internet." 82 Fed. Reg. at 59,658 (emphasis added). Without regard to the text of the statute, which makes no distinction between transmission media, the Register determined that only those transmission media identified in the DMCA Conference Report would be entitled to the grandfathered rate.[8] *Id.* at

---

[8] In *Muzak*, we looked to legislative history to resolve an ambiguity in the meaning of "service" as applied to the question presented in that case, but ultimately noted that the DMCA Conference Report was a particularly unreliable guide in interpreting Section 114's grandfathered rate provisions: "[F]or each point in the conference report supporting SoundExchange, there can be found a countervailing one in support of Muzak." 854 F.3d at 717 n.11. So too here. *Compare* H.R. Rept. No. 105-796, at 89 (identifying "cable" and "satellite" as the protected transmission media), *with id.* ("[I]f a cable subscription music service making transmissions on July 31, 1998, were to offer the same music service through the Internet, then such Internet service would be considered part of a preexisting subscription service.").

59,657 (requiring a subscription transmission to be made in "the specific transmission media identified" in the DMCA Conference Report to be eligible for the unconditional grandfathered rate) (citing H.R. Rep. No. 105-796, at 89 (1998)). The statute, however, speaks to this precise issue and precludes the Register's interpretation. As we have explained, the "preexisting subscription service" definition and the unconditional grandfathered rate provision distinguish between transmission media that were employed before July 31, 1998, and those offered after that date. The text does not single out internet transmissions for categorical exclusion from the grandfathered rate. "By introducing a limitation not found in the statute," the Register "alter[ed], rather than … interpret[ed]" the DMCA. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

Therefore, we vacate the Register's legal opinion and the part of the Board's Final Determination applying this opinion and remand to the Board to determine under the correct legal standard whether Music Choice's current service offering, including its internet transmissions, qualifies for the unconditional or conditional grandfathered rates. Because the Final Determination categorically excluded internet transmissions from the unconditional grandfathered rate, the Board had no occasion to assess whether Music Choice's current internet service offerings, including its mobile application and internet-exclusive channels, are a part of the service offering Music Choice provided on July 31, 1998. The Board cannot exclude from the unconditional grandfathered rate internet transmissions that were actually part of Music Choice's service offering on July 31, 1998.[9] On remand, the

---

[9] For any internet transmissions that do not qualify for the unconditional grandfathered rate, the Board retains discretion to determine if they qualify for the conditional grandfathered rate or if they should be excluded from both grandfathered rates. As noted

Board must determine the precise scope of Music Choice's service offering as it actually existed on July 31, 1998. While on the record below it is undisputed that Music Choice was making some internet transmissions at that date, there is a question about whether those transmissions were available outside the home. *See* 82 Fed. Reg. 59,660. Similarly, it has been suggested that Music Choice's internet-exclusive

---

above, the Board also held, based on the Register's legal opinion, that Music Choice's internet transmissions do not qualify for the conditional grandfathered rate "to the extent they are available outside a subscriber's residence." 83 Fed. Reg. at 65,227. Because we conclude that internet transmissions are not categorically excluded from the unconditional grandfathered rate, we need not consider Music Choice's challenge to the Board's application of the Register's "non-exhaustive" six-factor test under the conditional grandfathered rate. *Id.* at 65,226–227.

On remand, if the Board concludes that a part of Music Choice's internet offering does not qualify for the unconditional grandfathered rate, it must reconsider whether such transmissions qualify for the conditional grandfathered rate. This analysis must focus on whether the transmissions fit within the statute's definition of "preexisting subscription service," 17 U.S.C. § 114(j)(11), and the criteria enumerated in 17 U.S.C. § 114(d)(2)(C). Although we decline to review the six-factor test the Register set out to assess whether a transmission qualifies for the conditional grandfathered rate, we emphasize that factfinding, to the extent it is needed, must be conducted by the Board, and not the Register. *See* 17 U.S.C. § 802(f)(1)(A) (the Board "may consult with the Register of Copyrights on any matter other than a question of fact"); 17 U.S.C. § 802(f)(1)(B)(i) (confining the Register to legal determinations). We further emphasize that we do not seek to limit the Register's discretion in defining the legal parameters of a "preexisting subscription service," beyond what we have held above: the Register may not exclude internet transmissions from the definition if such internet transmissions were actually part of the preexisting service offering on July 31, 1998.

channels and smartphone applications are not part of the service offering Music Choice provided on the relevant date. *See* CRB Br. 37–38. The Board must sort through these issues on remand to determine which parts of Music Choice's current service offering are eligible for the grandfathered rate because they were a part of Music Choice's service on July 31, 1998.

## C.

Finally, we consider Music Choice's challenge to the Board's amendment of royalty audit procedures. Pursuant to its general authority to set royalty terms, 17 U.S.C. § 114(f)(1)(A), the Board and its predecessor agency have promulgated royalty audit procedures. Prior to the amendments at issue here, a preexisting service like Music Choice could secure an independent audit that would be treated as comprehensive and dispositive as to all parties during the Board's rate determination proceedings. 37 C.F.R. § 382.7(e) (2013) (establishing that an audit "performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all interested parties"). The Final Determination amends this regulation to provide that an independent audit will be determinative only as to the issues within the scope of the audit, thus potentially allowing other parties to conduct additional audits. 83 Fed. Reg. at 65,262, 65,268 (amending the provision so that independent audits "shall serve as an acceptable verification procedure for all parties with respect to the information *that is within the scope of the audit*") (emphasis added). The government and SoundExchange argue that the Board's amendment is not a substantive change. We disagree.

The Board's amendment makes a consequential revision to the audit procedure. Prior to the revision, Music Choice's

audit was treated as sufficient if conducted by an independent auditor pursuant to generally accepted auditing standards. Under the revision, SoundExchange is given permission to conduct audits of any matter outside the "scope of the audit." *Id.* at 65,262. This alteration imposes a new condition on Music Choice, by allowing additional audits beyond the independent audit that was previously deemed an "acceptable verification procedure." 37 C.F.R. § 382.7(e) (2013). Although the government and SoundExchange argue this is a clarification rather than a change, the agency has long understood the audit as a kind of safe harbor for preexisting services like Music Choice. For instance, in 1997, when CARP and the Librarian of Congress, the Board and Register's predecessors, created the defensive audit procedures, CARP stated that allowing the preexisting services to conduct their own audits rather than being subject to outside copyright owner audits would balance the "fair opportunity to audit for copyright owners" against "the burden and expense of auditing upon the Services." Copyright Arbitration Panel, Report No. 95-5 ¶ 194 (Nov. 12, 1997) (*adopted* 63 Fed. Reg. 25,394 (May 8, 1998)); *see also* 78 Fed. Reg. 23,054, 23,074 (Apr. 17, 2013). The Final Determination alters this calculus by explicitly giving SoundExchange the green light to "round out the findings with its own audit, limited to the points omitted from the scope of the defensive audit." 83 Fed. Reg. at 65,262. Further supporting the substantive nature of this change is Music Choice's record testimony—unacknowledged by the Board—that this change would upset its reliance on the previous audit procedure. *See* J.A. 80 ("Music Choice has availed itself of [the external independent audit], and has expended significant resources in doing so.").

Having found that the Final Determination's amendment of the audit provision is a substantive change, we must determine whether the Board "display[ed] awareness that it *is*

changing position" and demonstrated "good reasons for the new policy." *FCC v. Fox Television Stations Inc.*, 556 U.S. 502, 515 (2009). The Board failed on both counts. The Final Determination does not acknowledge the Board's rejection of a substantially identical proposal in its 2013 proceeding. There, the parties presented similar arguments for the same change and the Board rejected SoundExchange's position because it did not "adequately address[]" flaws pointed out by Music Choice. 78 Fed. Reg. at 23,074. Specifically, the Board noted that SoundExchange failed to rebut Music Choice's argument that the change would "permit SoundExchange to use auditors that are employees or officers of a sound recording owner or performing artists, the objectivity of which might be suspect." *Id.* The Board does not acknowledge this prior position, does not point to any evidence that these concerns have been ameliorated, and does not present any new reasons for adopting the amended audit procedure that it previously rejected. Moreover, the Board failed to address CARP's initial reasoning for instituting the defensive audit procedure, which sought to balance the preexisting services' burden and expense against copyright holders' audit rights. In the Final Determination, the Board struck a different balance in favor of SoundExchange without acknowledging or addressing the reasons for the policy shift.

Moreover, the Board did not give reasons for amending the audit provision, stating only that it can "see no reason not to" make the change. 83 Fed. Reg. at 65,262. Yet an agency's ipse dixit cannot substitute for reasoned decisionmaking. This court has rejected precisely this type of justification from the Board in the past: "[R]ational decisionmaking … requires more than an absence of contrary evidence; it requires substantial evidence to support a decision." *Intercollegiate Broad. Sys. v. CRB*, 574 F.3d 748, 767 (D.C. Cir. 2009). The Board also failed to respond to Music Choice's reliance interests arising from the

previous audit standard—a matter Music Choice specifically raised on the record during the proceeding. *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("A summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position.").

Perhaps the agency can justify its change in position, but its scant explanation and casual disregard for its former position do not satisfy the APA's requirements for rational decisionmaking. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) ("Agencies … must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (quotation marks omitted). Accordingly, we vacate the revised audit provision as arbitrary and capricious.

\* \* \*

We vacate Part IV(D) and Part XI(A)(3)(g) of the Final Determination and the Register of Copyright's underlying legal opinion. We remand for the Board to determine, in accordance with this opinion, whether Music Choice's internet transmissions qualify for the grandfathered rate and to reconsider the audit definition and provide a reasoned explanation if the Board determines the revised definition is justified.

*So ordered*.