# United States Court of Appeals
## For the First Circuit

No. 22-1859

RAFAEL ITHIER; EGC CORP., a/k/a El Gran Combo,

Plaintiffs, Appellees,

v.

CARLOS JUAN APONTE-CRUZ, a/k/a Charlie Aponte,

Defendant, Appellant,

JANE DOE; ABC INSURANCE COMPANY; COMPANY XYZ; RICHARD DOE; MARY ROE; CONJUGAL PARTNERSHIP APONTE-DOE; CONJUGAL PARTNERSHIP DOE-ROE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Barron, Chief Judge,
Montecalvo and Rikelman, Circuit Judges.

José A. Hernández Mayoral for appellant.
Roberto Sueiro Del Valle for appellees.
Tim Dadson, Brieanne Jackson, Matthew S. Hellman, Jennifer P. Garner, Jeffrey P. Bennett, Danielle S. Van Lier, Steven R. Englund, Eric E. Petry, SoundExchange, Inc., Jenner & Block LLP, American Federation of Musicians of the United States and Canada, and SAG-AFTRA were on brief for SoundExchange, Inc., the American Federation of Musicians of the United States and Canada, and Screen

Actors Guild -- American Federation of Television and Radio Artists, amici curiae.

June 18, 2024

**BARRON, <u>Chief Judge</u>.** If you think that Paul, John, George, and Ringo were "the recording artist[s] . . . featured" on the White Album -- even though that iconic record's cover mentioned none of The Beatles by name -- then you will not be surprised by the analysis that follows. The prompt for our analysis, however, is not a trivia question. It is an appeal from a judgment by the United States District Court for the District of Puerto Rico in connection with a dispute between the owners of El Gran Combo -- one of the most popular Puerto Rican bands in history -- and the band's former lead vocalist, Carlos Aponte-Cruz. The dispute concerns the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA"), Pub. L. No. 104-39, 109 Stat. 336, which entitles the "recording artist or artists featured on [a] sound recording" to a 45% share of certain royalties that the recording generated. 17 U.S.C. § 114(g)(2)(D).

Aponte-Cruz contends that he is the "artist . . . featured" on certain El Gran Combo sound recordings for which he was the lead vocalist and so is entitled to his portion of the 45% share of the statutory royalties for those recordings. <u>Id.</u> The owners of El Gran Combo contend that the band -- as an independent entity distinct from any of its individual members -- is itself the "artist . . . featured" on those recordings. <u>Id.</u> They thus contend that only the company that owns the band, EGC Corp., and the company's sole owner, Rafael

- 3 -

Ithier, have an entitlement to the 45% royalty share in the recordings at issue.  Id.

We conclude that even though the covers for the El Gran Combo albums that contain the disputed recordings refer only to the band itself and not to any of its individual members, the Paul (or, if you prefer, the John) of El Gran Combo, Aponte-Cruz, is a "recording artist . . . featured" on the recordings in dispute and that neither EGC Corp. nor Ithier is.  Id.  Accordingly, we reverse both the District Court's ruling granting summary judgment to EGC Corp. and Ithier on their claims for declaratory relief under § 114(g)(2)(D) and the District Court's ruling denying summary judgment to Aponte-Cruz on his claims for that same kind of relief.

**I.**

The following facts are not in dispute.  Ithier founded the musical group El Gran Combo in 1962 and created EGC Corp. to administer his rights in the band.  El Gran Combo typically has fourteen members: three singers, two saxophonists, two trumpeters, a trombonist, a bassist, a pianist, a timbalero, a conguero, a bongosero, and a director.

Ithier selects the band's members.  He also hires backup vocalists or chorus members who are not members of the band but who perform on some of the band's sound recordings.

Carlos Aponte-Cruz was a member of El Gran Combo from 1973 to 2014. He was a lead vocalist in over 200 of the band's sound recordings.

The section of the U.S. Code in question -- 17 U.S.C. § 114(g) -- was enacted as part of DPRA, which amended the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, to establish an exclusive right to perform a copyrighted work publicly by means of a digital audio transmission, 17 U.S.C. § 106(6), and to provide a statutory framework for the payment of royalties from those digital transmissions to the intended beneficiaries, id. § 114(g). See SoundExchange, Inc. v. Copyright Royalty Bd., 904 F.3d 41, 46 (D.C. Cir. 2018). Section 114(g) reads, in relevant part, as follows:

> (g) Proceeds from licensing of transmissions.--
>
> > (1) Except in the case of a transmission licensed under a statutory license in accordance with subsection (f) of this section--
> >
> > > (A) a featured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the artist's contract; and
> > >
> > > (B) a nonfeatured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the nonfeatured recording artist's

- 5 -

applicable contract or other applicable agreement.

(2) Except as provided for in paragraph (6), a nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions in accordance with subsection (f) shall distribute such receipts as follows:

(A) 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.

(B) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

(C) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

(D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

Until the passage of the Small Webcaster Settlement Act of 2002 ("SWSA"), Pub. L. No. 107-321, 116 Stat. 2780, royalties

- 6 -

for sound recordings were distributed by the owners of copyrights in the recordings. SWSA amended § 114(g)(2) to establish "[a]n agent designated to distribute receipts from the licensing of transmissions."[1] § 5(c). SoundExchange, Inc. ("SoundExchange"), a nonprofit performance-rights organization, is the "nonprofit collective designated by the Copyright Royalty Judges [pursuant to SWSA's amendment to § 114(g)(2)] to distribute receipts from the licensing of transmissions." 17 U.S.C. § 114(g)(2); see 37 C.F.R. § 380.4(d)(1); SoundExchange, Inc. v. Muzak LLC, 854 F.3d 713, 715 (D.C. Cir. 2017). Representing the owners of sound-recording copyrights and the recording artists who performed on those recordings, SoundExchange collects royalties paid pursuant to the statutory license under § 114 of the Copyright Act of 1976, as amended and codified, and accordingly distributes those royalties to the artists who performed on the sound recordings as well as the copyright owners of the sound recordings.

For years, SoundExchange had been remitting all El Gran Combo statutory royalties to EGC Corp., although the company has not distributed any of those royalties to the members of El Gran Combo. In 2017, however, SoundExchange shifted course after

---

[1] Congress has since amended 17 U.S.C. § 114(g)(2) to provide that it is "a nonprofit collective designated by the Copyright Royalty Judges" that is authorized to "distribute receipts from the licensing of transmissions." Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, § 302(c), 132 Stat. 3676, 3740 (2018).

Aponte-Cruz, having by then left El Gran Combo, made a formal request to SoundExchange for the statutory royalties that he claimed he was entitled to under § 114(g)(2)(D) for sound recordings in which he had performed as the lead vocalist for El Gran Combo. Aponte-Cruz based the request on his assertion that he was a "recording artist . . . featured on [the] sound recording[s]," id., and in response SoundExchange froze all payments of royalties under § 114(g)(2)(D) that were related to the sound recordings in which Aponte-Cruz appeared as lead singer for El Gran Combo.

Thereafter, on November 8, 2019, Ithier and EGC Corp. filed suit against Aponte-Cruz in the District of Puerto Rico for a judgment declaring that (1) "Ithier is the sole owner of the right to collect royalties as Artist from Sound Exchange as a featured artist," (2) "during Aponte's Tenure in [El Gran Combo] the defendant was an employee for hire for El Gran Combo making Plaintiff the sole proprietor of any rights to collect royalties from Sound Exchange," and (3) "Aponte[] is a non-featured artist with a right to collect royalties as a non-featured Artist from Sound Exchange." Aponte-Cruz filed an answer to Ithier and EGC Corp.'s complaint on April 7, 2021, and he also filed at that time a counterclaim for a declaratory judgment in favor of "defendant Aponte ruling that he is entitled to collect royalties from Sound Exchange as a performer in El Gran Combo sound recordings . . . and

- 8 -

that plaintiffs must pay Aponte's share on royalties collected from Sound Exchange that have not been distributed to the band's performers."

Aponte-Cruz then moved for summary judgment on his counterclaim for declaratory relief, requesting that the District Court "rule that 'the recording artist or artists featured on such sound recording' in [17 U.S.C. § 114(g)(2)(D)] are the members of El Gran Combo that performed on each sound recording and that those royalties are to be divided among them in the manner Sound Exchange determines appropriate." Ithier and EGC Corp. filed a cross-motion for summary judgment on their claims for declaratory relief.

The District Court referred the matter to a Magistrate Judge for a Report and Recommendation ("R&R"). The R&R recommended that the District Court grant the cross-motion for summary judgment and deny Aponte-Cruz's motion.

Over Aponte-Cruz's objection to the R&R, the District Court issued an Order adopting the R&R, and Judgment was entered on the same day "granting declaratory relief in favor of Plaintiff Rafael Ithier." The District Court ruled that

> (i) El Gran Combo, a distinct legal entity organized as a corporation, is the group most prominently featured on the sound recordings and, thus, is entitled to collect the royalties as the featured artist; and (ii) Rafael Ithier, as the sole owner of El Gran Combo, is entitled to collect the featured artist royalties due to the corporation.

- 9 -

Aponte-Cruz timely appealed. SoundExchange, the American Federation of Musicians of the United States and Canada, and the Screen Actors Guild -- American Federation of Television and Radio Artists filed an amicus brief in support of Aponte-Cruz. The amicus brief argues, among other things, that the District Court's decision "that [Ithier as band owner is entitled to collect the featured-artist royalties rather than El Gran Combo's band members like Aponte-Cruz] is a radical departure from the distribution policies and practices that SoundExchange has implemented over the last 20 years based on Section 114(g)(2)(D) and international recording industry norms." The brief elaborates on this assertion by stating that "SoundExchange's distribution policies and practices and the international system for distributing performance royalties are all based on the premise that a featured performing group is its members."

## II.

We review the District Court's summary-judgment rulings de novo and draw all inferences in favor of the party against whom summary judgment was entered. Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 732-33 (1st Cir. 2022). Summary judgment is appropriate if, based on the record, there remains no dispute of material fact -- that is, if, based on the record, there is no factual determination which a "rational factfinder" could make as to the "existence or nonexistence" of a fact that "has the

- 10 -

potential to change the outcome of the suit" -- such that "the moving party is entitled to judgment as a matter of law." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4-5 (1st Cir. 2010). Although the parties have filed cross-motions for summary judgment, we review each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and we determine, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).

## III.

The key issue turns on the following question about the phrase "recording artist or artists featured on such sound recording" in § 114(g)(2)(D). Does that phrase, with respect to the sound recordings in question, refer to El Gran Combo as a distinct entity independent of any of the band's individual members or only to the individuals who make up the band, including Aponte-Cruz as the lead vocalist? Before directly addressing that question, however, we first must address whether Aponte-Cruz failed to raise below the arguments that he is now making on appeal -- namely, that he is the "artist . . . featured" on the recordings in question because he appeared on those recordings as a member of El Gran Combo. Id.; see Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 14 n.2 (1st Cir. 2007) ("A

party . . . forfeits a right by failing to assert it in a timely manner.").

Ithier and EGC Corp. intimate that Aponte-Cruz either forfeited or waived the arguments he is making on appeal by failing to raise them below, as Ithier and EGC Corp. contend that Aponte-Cruz argued in the proceedings in the District Court only that he "was an individual with a right to the featured artist's royalties" and did not make a "claim for royalties as a[n El Gran Combo band] member."  But we disagree.

The record shows that Aponte-Cruz's arguments on behalf of his position below mirror his arguments to us.  For example, in his motion for summary judgment, Aponte-Cruz stated, "The matter for this Court to adjudicate is whether under [17 U.S.C. § 114(g)(2)(D)], 'the recording artist or artists featured on such sound recording' is Ithier as the band owner, or the members of the band within which Carlos Aponte is lead singer."  Aponte-Cruz went on to state his position that "the statutory framework [and] the common meaning of the [statutory] terms . . . make clear that 'the recording artist or artists featured on such sound recording' is a reference to the human beings performing and producing the

sounds that are heard in the sound recording, not the owner of the band."  We thus move on to the merits.[2]

**IV.**

Ithier and EGC Corp. contend that we must affirm the judgment below because the District Court was right to hold that: (1) "El Gran Combo, a distinct legal entity organized as a corporation, is the group most prominently featured on the sound recordings and, thus, is entitled to collect the royalties as the featured artist"; and (2) "Rafael Ithier, as the sole owner of El Gran Combo, is entitled to collect the featured artist royalties due to the corporation."  In so arguing, Ithier and EGC Corp. do not dispute that the construction of the statute that they propose -- and that the District Court adopted -- would upset the way that the statute has long been implemented.

As we have noted, SoundExchange, the American Federation of Musicians of the United States and Canada, and the Screen Actors Guild -- American Federation of Television and Radio Artists explain in their amicus brief to us that SoundExchange has been

_____

[2] To fend off the suggestion of forfeiture and waiver, Aponte-Cruz contends that the Magistrate Judge and the District Court misconstrued the basis for his request for declaratory relief.  He argues that they failed to grasp that the basis for that request was that "'featured artist' in this context[] means the band as a whole whose members performed on the sound recording."  We disagree, however.  The Magistrate Judge specifically stated in her R&R that "Aponte argues that the members of the band El Gran Combo are all featured artists under the statute and are entitled to a share of 45% of the royalties."

the "nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions" under § 114(g)(2) for the last two decades. See 37 C.F.R. § 380.4(d). And, although the record shows that, here, SoundExchange distributed the relevant royalties to EGC Corp. prior to the advent of this suit, the amicus brief notes -- without dispute by Ithier or EGC Corp. -- that in its capacity as the designated nonprofit collective, SoundExchange's longstanding practice is to "distribute 45% of statutory royalties to the solo artist, or members of a group of artists, featured on a recording" and not to the owners of the band, regardless of whether the cover of an album that contains a recording mentions only the band and thus none of the band's members.

Ithier and EGC Corp. nonetheless contend that the District Court's contrary construction is required by both the text of the statutory provision at issue and, insofar as the text alone is not dispositive, the relevant legislative history. We cannot agree.

**A.**

With respect to the statute's text, see United States v. Winczuk, 67 F.4th 11, 16 (1st Cir. 2023) ("[Using the normal tools of statutory interpretation, w]e begin, as always, with the text of the statute."), Ithier and EGC Corp. recognize that no statutory provision defines either the phrase "the recording artist or

- 14 -

artists featured on such sound recording" or any of that phrase's constituent parts.  17 U.S.C. § 114(g)(2)(D).  But they contend the ordinary meaning of the word "featured" shows that their position is right.

To make that case, Ithier and EGC Corp. point to a dictionary definition of the word "featured": "displayed, advertised, or presented as a special attraction."  Featured, Merriam-Webster (May 16, 2024), https://www.merriam-webster.com/dictionary/featured [https://perma.cc/9NL7-7822]. They then contend that, because we generally presume that Congress intends the words that it uses in statutes to have their ordinary meaning, see Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388 (1993), the statutory provision's use of the word "featured" requires that we "focus on the sound recording album covers" to determine which artist was "featured."[3]  After all, they assert, there is no better place to look to determine the "artist" that is "displayed, advertised, or presented as a

_____

[3] In support of their contention that we should "focus on the sound recording album covers" to determine which artist was "featured," Ithier and EGC Corp. also note that SoundExchange's "Key Terms for Creators" page on its website states that "[t]he term Artist refers [to] the group, band, or individual name as it appears on the release of a recording." Key Terms for Creators, SoundExchange, https://www.soundexchange.com/what-we-do/forartists-labels-and-producers/key-terms/ [https://perma.cc/RYE5-TH29].  But we do not find this definitional argument persuasive because such an argument "finds no support in the language of the statute [or] in precedent." United States v. Newton, 891 F.2d 944, 951 (1st Cir. 1989).

- 15 -

special attraction" for a given sound recording than the cover of the album that contains that recording. Featured, supra. And from there, Ithier and EGC Corp. go on to assert that, because the album covers for the sound recordings at issue refer solely to "El Gran Combo" and not to any of the band's individual members, the band as an independent entity is alone "displayed, advertised, or presented as a special attraction." Id. Therefore, Ithier and EGC Corp. contend, "the recording artist or artists featured on such sound recording," 17 U.S.C. § 114(g)(2)(D), is the band as a distinct entity and not any of its individual members. And so, according to Ithier and EGC Corp., the corporation that owns the band (EGC Corp.), and thus Ithier as the sole owner of that corporation, is the "recording artist . . . featured" on the recordings in question. Id.

Ithier and EGC Corp. also emphasize that this construction of § 114(g)(2)(D) would not preclude Aponte-Cruz -- or any other member of El Gran Combo -- from collecting statutory royalties. Aponte-Cruz would still be entitled on this reading to his portion of the 2.5% of statutory royalties "distributed to nonfeatured vocalists . . . who have performed on sound recordings" for the recordings on which he was the lead vocalist, just as (presumably) the individual members of The Beatles would be under EGC Corp. and Ithier's construction of the provision for

- 16 -

their work as "nonfeatured" artists on the White Album's sound recordings. Id. § 114(g)(2)(C).

Indeed, Ithier and EGC Corp. contend that unless § 114(g)(2)(D) is read as they read it, §§ 114(g)(2)(B) and 114(g)(2)(C) -- which provide, respectively, for the payment of statutory royalties to "nonfeatured musicians" and "nonfeatured vocalists" -- would be rendered superfluous. For, they contend, under Aponte-Cruz's contrary reading of § 114(g)(2), all members of a band (be that band El Gran Combo or The Beatles) would be considered "featured" artists under § 114(g)(2)(D) while no member of the band would be considered a "nonfeatured" musician or vocalist.

We are not persuaded. Ithier and EGC Corp. are, of course, right that the statute's use of the word "featured" distinguishes between "recording artist[s]" who are "featured" and those who are "nonfeatured." Id. § 114(g). But the use of the word "featured" does not in and of itself tell us that the "recording artist or artists featured" on the sound recordings on a band's album cannot be any of the individual members of that band whenever the album cover refers only to the band itself and not to any of the individual members. Id. § 114(g)(2)(D).

As Aponte-Cruz explains, the word "featured" could simply require us -- when confronted with such an album cover -- to treat as "featured" the individual natural persons who are

- 17 -

members of the band named on the cover and as "nonfeatured" any session musicians, backup vocalists, or chorus members who also appear on the sound recordings but are not members of the band. After all, there is nothing strained about concluding that such individual band members are "presented as a special attraction" on the "sound recording[s]" through the album cover's reference to the band itself, given that the band is, in the end, a collection of individuals. Featured, supra; 17 U.S.C. § 114(g)(2)(D).

Moreover, although neither § 114(g) nor any other section of the Copyright Act of 1976 specifically defines "the recording artist or artists featured on such sound recording," id. § 114(g)(2)(D), § 114(g)(1)(A) does refer, in describing a "featured recording artist," to "who performs on a sound recording" (emphasis added). And the word "who," especially when used as the subject of the subordinate clause that uses the verb "performs," is most comfortably read to be referring to a natural person rather than an artificial entity.

Indeed, this conclusion comports with the "Definitions" section of the Copyright Act of 1976 as amended and codified. That section provides that "[t]o 'perform' a work means to recite, render, play, dance, or act it, either directly or by means of any device or process," and it is people, not artificial, nonphysical entities like a corporation, that "recite, render, play, dance, or act," id. § 101, even when those individuals do so collectively.

- 18 -

We also note that, if the phrase "the recording artist or artists featured on such sound recording," id. § 114(g)(2)(D), were not construed to refer to the natural persons who "perform" on the sound recordings, then the statute would contain a curious ambiguity about who would be entitled to the 45% share of the statutory royalties, id. § 101. To be sure, Ithier and EGC Corp. contend that the "recording artist . . . featured" here clearly is EGC Corp. (and thus Ithier as its owner), as that company owns El Gran Combo. Id. § 114(g)(2)(D). But Ithier had no clear answer at oral argument as to the meaning of "recording artist . . . featured" in the case of an unincorporated band, id., as he variously described the featured artist in that case as the person who determines who is in the band and the person who founded the band. See In re Graves, 33 F.3d 242, 249 n.14 (3d Cir. 1994) ("When interpreting a statute a construction which would create confusion should be avoided." (internal quotation marks and citation omitted)).

Additionally, we note that, in construing "the recording artist[s] . . . featured," 17 U.S.C. § 114(g)(2)(D), on El Gran Combo's sound recordings to refer to each of the individual members of that band, we do not thereby render either § 114(g)(2)(B) or § 114(g)(2)(C) superfluous in referring, respectively, to "nonfeatured musicians" and "nonfeatured vocalists." Those provisions would be fully applicable in the case of any band that

hires session musicians, backup vocalists, or chorus members who are not members of the band but who perform on some of the band's sound recordings. And, we must say, there is some intuitive appeal to the notion that Congress did not use the word "featured" to equate a star like Lennon or McCartney with a session musician like Frederick Alexander (who played the cello for "Martha My Dear" on the White Album), such that each would be entitled to only equal portions of the 5% share of royalties owed to "nonfeatured" artists.[4]  Id. § 114(g)(2).

In sum, the statutory provision in question refers to a "recording artist . . . featured" on a sound recording, id. § 114(g)(2)(D), and then elsewhere refers to such an "artist" as one "who performs" -- and thus one who "recite[s], render[s], play[s], dance[s], or act[s]," id. §§ 101, 114(g)(1)(A).  As a result, the statute's text is most naturally read to be referring to an individual person -- and not a disembodied entity -- in referring to an "artist."  For that reason, the statutory text points against the construction that Ithier and EGC Corp. favor and toward the construction that Aponte-Cruz advances.  And so, if the statutory text were our only guide, we would see no reason to

---

[4] We note that this reading of the word "featured" also appears to accord with commonly understood and accepted terms of art in the music industry, including that "artists" are human beings and that the terms "nonfeatured" vocalist and musician refer to backup singers and session musicians, respectively.

construe the provisions at issue as Ithier and EGC Corp. contend that we must.

## B.

Ithier and EGC Corp. do separately contend that even if the statutory text does not compel their construction of § 114(g)(2)(D), the legislative history of the Copyright Act of 1976 and its amendments does. But we cannot agree, even assuming that the text is not so clearly supportive of Aponte-Cruz's position as to render the inquiry into the legislative history unnecessary. See Telecomms. Regul. Bd. P.R. v. CTIA-Wireless Ass'n, 752 F.3d 60, 66 (1st Cir. 2014) ("Where the text of a statute is clear, as it is here, we need not go on to consider the act's legislative history to divine Congress's intent. . . . Nevertheless, in an abundance of caution, we will proceed to consider . . . Appellants' argument that our interpretation of the statute is contrary to congressional purpose as evidenced by the [statute's] legislative history.").

For starters, much of the legislative history appears to contemplate that "the recording artist or artists featured on such sound recordings" would be natural persons and thus to support Aponte-Cruz's natural-person-based reading of "recording artist . . . featured." 17 U.S.C. § 114(g)(2)(D). For example, in presenting the bill that eventually became DPRA to the Senate Floor, Senator Orrin Hatch stated, "Mr. President, it is important

- 21 -

that the creators of America's music -- whether they compose the score, write the lyrics, sing the songs, or produce the recordings -- be fairly and equitably compensated for the public performances that result. For too long they have not been." 141 Cong. Rec. S11949 (daily ed. Aug. 8, 1995) (statement of Sen. Orrin Hatch) (emphasis added).

Indeed, while Congress initially envisioned statutory royalties flowing through copyright owners like record companies, in 2002 Congress amended § 114(g)(2) to provide even more protection to recording artists by codifying arrangements to pay them directly through a collective like SoundExchange, rather than through record companies and other copyright owners. See SWSA, Pub. L. No. 107-321, § 5, 116 Stat. 2780, 2784-85. As Representative John Conyers, Jr. stated during House consideration of SWSA:

> This bill has several provisions that will make it easier for music to be performed online and for the creators to be compensated. . . . I am especially pleased that the final legislation includes a statutory direct payment provision. This provision ensures the musicians, vocalists, and artists receive their royalties from digital music directly from the collection agent instead of through other intermediaries.

148 Cong. Rec. H7047 (daily ed. Oct. 7, 2002) (statement of Rep. John Conyers, Jr.) (emphasis added); see also, e.g., Copyright Royalties: Where Is the Right Spot on the Dial for Webcasting?:

Hearing on H.R. 5469 Before the S. Judiciary Comm., 107th Cong. 132 (2002) (statement of Dan Navarro, Member, Am. Fed'n of Television & Radio Artists & the Am. Fed'n of Musicians of the U.S. & Can.) ("Congress redressed a small part of the unfair position to which American performers had been relegated when it passed [DPRA]. For the first time, Congress required that at least some public performances of recorded music require payment to the creators of that music for the right to perform [their] work." (emphasis added)).

In nonetheless arguing that the legislative history of DPRA favors their position, Ithier and EGC Corp. rely chiefly on the portion of the Senate Report that clarified the following with respect to the term "featured recording artist" as used in another provision of § 114 that does not itself pertain to royalties at all. That passage reads as follows:

> The term "featured recording artist" means the performing group or ensemble or, if not a group or ensemble, the individual performer, identified most prominently in print on, or otherwise in connection with, the phonorecord actually being performed. Except in the case of a sound recording consisting of a compilation of sound recordings by more than one performer or group or ensemble, there will ordinarily be only one "featured recording artist" per phonorecord. A vocalist or soloist performing along with a group or ensemble is not a "featured recording artist" unless that person is identified in connection with the phonorecord as the primary performer. For example, the Eagles would be the "featured recording artist" on a track from an Eagles

album that does not feature Don Henley by name with equal prominence; but if the same sound recording were performed from "Don Henley's Greatest Hits," then Don Henley and not the Eagles would be the "featured recording artist." Where both the vocalist or soloist and the group or ensemble are identified as a single entity and with equal prominence (such as "Diana Ross and the Supremes"), both the individual and the group qualify as the "featured recording artist."

S. Rep. No. 104-128, at 36 (1995) (emphasis added).

Ithier and EGC Corp. contend that this passage reveals that the featured recording artist is "the artist 'most prominently included in print on, or otherwise in connection with, the phonorecords performed.'" Id. And so, they contend, this passage shows that the "featured recording artist" here is El Gran Combo the entity and not any individual member of it. Id.

But, although the Senate Report states that "the Eagles would be the 'featured recording artist' on a track from an Eagles album that does not feature Don Henley by name with equal prominence," id., when this portion of the Senate Report is read in context, it provides no support to Ithier and EGC Corp.'s position. The Senate Report is addressing the "sound recording performance complement," see 17 U.S.C. §§ 114(d)(2)(B)(i), (C)(i), (j)(13), which is a requirement that limits the number of times within a three-hour period that a statutory licensee can play recordings from the same album or "featured recording artist," S. Rep. No. 104-128, at 36. The examples the Senate Report uses are

- 24 -

thus directed to the practical problems that a radio station or other service provider playing a recording from a physical album in 1995, or more recently playing a digital file with limited identifying metadata, has tracking compliance with the performance complement. See id.

For that reason, the examples given in the Senate Report are best read to be simply clarifying that a radio station or other service provider playing a sound recording from an album on which a person is performing as part of a band can play a sound recording from another album on which that same person is performing in a different capacity without necessarily running afoul of the "sound recording performance complement." See 17 U.S.C. §§ 114(d)(2)(B)(i), (C)(i), (j)(13). As the Senate Report explains by way of example, a radio station or other service provider could play a song from an Eagles album that does not separately display the name of Don Henley -- one of the band's members -- prominently on the album cover. See S. Rep. No. 104-128, at 36. But playing that same song from a "Don Henley's Greatest Hits" album within a three-hour period would not count against the radio station or other service provider for purposes of the performance complement because Don Henley is playing in his capacity as a member of the band in one of the recordings and in his capacity as an individual artist in the other. See id.

Similarly, it is undisputed here that Aponte-Cruz was once a member of El Gran Combo and, having left El Gran Combo in 2014, Aponte-Cruz now performs as a solo act and receives separate payments as a featured artist from the albums he has released in his solo-act capacity after he left El Gran Combo. But receiving statutory royalties for being the featured artist on a solo album is not in tension with also receiving statutory royalties as a member of a band -- and thus also as one of the featured artists -- on a band's album. We thus do not understand this passage in the Senate Report to be weighing in on the point in dispute here -- whether a "featured" artist in § 114(g)(2)(D) is the band as an entity independent of its individual members or instead the individual members of that band.

## C.

In sum, Ithier and EGC Corp. ask us to reject the way that 17 U.S.C. § 114(g) has been implemented for at least the past twenty years. And they do so chiefly based on a textual assertion that relies wholly on an argument about the word "featured" that does not hold up when considered carefully. Insofar as they mean to say that the legislative history also shows that their understanding of the word "featured" is the correct one, moreover,

that contention also fails, for all the reasons set forth above.[5]
See Am. Fuel & Petrochemical Mfrs. v. EPA, 3 F.4th 373, 383 (D.C.
Cir. 2021) ("[A]mbiguous [legislative] history hardly suffices to
overcome the plain text [of the statute in question], for courts
'do not resort to legislative history to cloud a statutory text
that is clear.'" (quoting Ratzlaf v. United States, 510 U.S. 135,
147-48 (1994))).  As a result, we conclude that Aponte-Cruz is
"the recording artist . . . featured on such sound recording," 17
U.S.C. § 114(g)(2)(D), and so is entitled to the statutory
royalties he claims are his, notwithstanding the District Court's
conclusion to the contrary.[6]

---

[5] Ithier and EGC Corp. also argue that "the internal contractual relationship between Aponte and Ithier should be the central focus of the featured artist's inquiry because it is the deciding factor and thus, dispositive of the featured artist issue." See Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730 (1989).  But, even assuming that a contract between Aponte-Cruz and Ithier and EGC Corp. that renounced the statutory royalties at issue here would be valid, Ithier and EGC Corp. admitted at oral argument that there was no such contract entered into here.

[6] Ithier did play as a member of El Gran Combo in some of the band's recordings as a pianist.  Consistent with our holding here, he would be entitled to featured-artist statutory royalties generated by those recordings because he played on those recordings as a member of El Gran Combo.  For the reasons we have explained, he would not, however, be entitled to featured-artist royalties for those recordings simply because he is the owner of EGC Corp.

**V.**

The District Court's award of summary judgment to Ithier and EGC Corp. and its denial of summary judgment to Aponte-Cruz are both **reversed**.  The parties shall bear their own costs.